UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

PAMELA BAUMAN,

                     Plaintiff,

           v.

2810026 CANADA LIMITED,
2810034 CANADA LIMITED,
FREDERICK GROUP INC., and
AMARJIT SINGH,

                    Defendants.
_____

|  |  |
|---|---|
|  | REPORT |
|  | and |
|  | RECOMMENDATION |
|  |  |
|  | 15-CV-00374A(F) |

APPEARANCES:        DAVID W. POLAK, ESQ.
                           Attorney for Plaintiff
                           3686 Seneca Street
                           West Seneca, New York  14224

                           WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP
                           Attorneys for Defendants
                           BEATA SHAPIRO, of Counsel
                           260 Franklin Street
                           14th Floor
                           Boston, Massachusetts  02110
                                 and
                           BRIAN DEL GATTO, of Counsel
                           1133 Westchester Avenue
                           White Plains, New York  10604

## **JURISDICTION**

On August 10, 2015, this case was referred to the undersigned by Honorable

Richard J. Arcara for all pretrial matters including preparation of a report and

recommendation on dispositive motions.  The matter is presently before the court on

Defendants' motions to dismiss, filed December 16, 2016 (B Dkt. 49),[1] and Defendants'

motion for summary judgment, filed February 13, 2017 (B Dkt. 56).[2]

## BACKGROUND

On November 3, 2014, Plaintiff Pamela Bauman ("Plaintiff" or "Bauman"), filed a

Summons and Complaint in New York Supreme Court, Erie County, against Defendants

2810026 Canada Limited ("2810026 Canada Ltd."), 2810034 Canada Limited ("2810034

Canada Ltd."), Frederick Group Inc., and Amarjit Singh ("Singh") (together,

"Defendants"), seeking to recover for personal injuries Bauman allegedly sustained

following an automobile accident on November 9, 2011, in Buffalo, New York ("Buffalo")

("the collision"). In particular, Bauman was the driver of a vehicle ("Bauman's vehicle"),

in which one Jeffrey Roth ("Roth"), was a passenger, when Bauman's vehicle was

involved in a collision with a tractor-trailer owned and operated by Defendant Singh.

Although the Complaint did not allege an amount in controversy, Defendants' counsel

served Bauman with a Notice to Admit that the amount in controversy in this action,

exclusive of interests and costs, exceeds $ 75,000. When Bauman failed to respond to

the Notice to Admit, the request, pursuant to N.Y. Civ.Prac.L.and R. § 3123 (McKinney's

---

[1] In the interests of clarity and simplicity, and to avoid overlooking any arguments relevant to the pending motions, the court considers all papers filed in two related actions, including the instant action commenced by Pamela Bauman, 15-CV-00374A(F) ("Bauman Action"), and a separate action commenced by Jeffrey Roth, 13-CV-00901A(F) ("Roth Action"), referring to documents filed in the Bauman Action as "B Dkt. __," and to documents filed in the Roth Action as "R Dkt. __." In an effort to avoid ungainly construction, where documents are filed multiple times either in the same action or in both actions, the court references only one of the filings. Furthermore, because all parties have filed numerous papers with the same or similar titles in both actions, and have sometimes filed the same papers in both actions, the court, in referencing any document, does not assign any document an abbreviated name but simply refers to each document only by its relevant docket item number.
[2] Defendants' motions to enforce sanctions, filed July 31, 2017 (B Dkt. 67), and to strike, filed August 31, 2017 (B Dkt. 70), will be addressed in a separate Decision and Order.

1963) (providing a party may serve a written request for admission upon another party and if, within 20 days after being served with a request to admit, the requested party does not respond, the matter is deemed admitted), Defendants 2810026 Canada Ltd., 2810034 Canada Ltd. and Frederick Group, Inc. (together, "Corporate Defendants"), on April 28, 2015, removed the action to this court ("Bauman Action"), pursuant to 28 U.S.C. § 1446 ("§ 1446"), asserting complete diversity of citizenship between the parties, in accordance with 28 U.S.C. § 1332 ("§ 1332"), as the basis for subject matter jurisdiction in this court.[3]  Before Bauman commenced the instant action, Roth, on June 21, 2003, commenced in New York Supreme Court, Erie County, a personal injury action seeking to recover from the same Defendants in this action for injuries allegedly sustained in the collision.  On September 4, 2013, Defendants, pursuant to § 1441, asserting subject matter jurisdiction based on complete diversity between the parties under § 1332, removed the action to this court where the action was assigned Dkt. 13-CV-00901A(F) ("Roth Action").[4, 5]  On October 6, 2015, the Roth Action and the Bauman Action were consolidated for purposes of discovery, scheduling and case administration associated with pre-trial matters, yet the cases remain separate for all other purposes.  R Dkt. 37; B Dkt. 6.

---

[3] Because Singh had yet to be served with the Summons and Complaint, Singh was not required to, and in fact did not, join in the removal.

[4] Although the Roth Action and the Bauman Action were not consolidated for purposes of motion practice, including dispositive motions, both parties have erroneously filed various motion papers in the wrong case, and at other times have filed the same papers in both actions and also have filed papers containing arguments pertaining to motions filed in both cases.

[5] In their answer filed in the Roth Action, R Dkt. 4, Defendants 2810026 Canada Ltd., 2810034 Canada Ltd., and Frederick Group, Inc., assert cross-claims for indemnification and contribution against Bauman, making Bauman a Third-Party Defendant to the Roth Action, in which Bauman is represented by separate counsel, Adam C. Ferrandino, Esq.

On December 16, 2016, Defendants 2810026 Canada Ltd., 2810034 Canada Ltd., and Frederick Group, Inc. ("Corporate Defendants"), moved to dismiss the Bauman Action for failure to comply with court-ordered discovery (B Dkt. 49) ("Motion to Dismiss").  On February 6, 2017, Roth and Bauman (together, "Plaintiffs"),[6] filed the Affirmation of David W. Polak, Esq. in Opposition to Defendants' Motion to Dismiss (B Dkt. 53), attaching Exhibits D and B to B Dkt. 41 (respectively, B Dkt. 53-1 and 53-2).

On February 13, 2017, Corporate Defendants filed their motion for summary judgment (B Dkt. 56) ("Corporate Defendants' Summary Judgment Motion"), attaching the Memorandum of Law in Support of Defendants 2810026 Canada Limited, 2810034 Canada Limited and Frederick Group Inc.'s Joint Motion for Summary Judgment (B Dkt. 56-1), with exhibits A through J (B Dkt. 55-2 through 55-11).  Also filed on February 13, 2017, was a motion by Bauman, as Third-Party Defendant in the Roth Action, seeking summary judgment only on the issue of negligence (R Dkt. 70).

On February 16, 2017, Corporate Defendants filed Defendants 2810026 Canada Limited, 2810034 Canada Limited and Frederick Group Inc.'s Affirmation in Support of Motion to Dismiss all Claims by Plaintiff Pamela Bauman and Opposition to Plaintiff's Motion to Reconsider (B Dkt. 57), attaching exhibit A (B Dkt. 57-1).

On April 7, 2017, Corporate Defendants filed as a single document the Affirmation, Statement of Facts, and Memorandum of Law in Support of Defendant 2810026 Canada Limited Ltd., 2810034 Canada Limited, and Frederick Group Inc.'s Opposition to Plaintiff Bauman's Motion for Summary Judgment (R Dkt. 75), containing

---

[6] Because the separate actions filed by Roth and Bauman are based on the same incident, the court refers to them together as "Plaintiffs" when doing so is supported by the context of this Report and Recommendation.

the Affirmation of Beata Shapiro, Esq. (R Dkt. 75 at 1-2), Defendant's Response to

Bauman's Statement of Undisputed Facts (R Dkt. 75 at 2-18), and a Memorandum of

Law (R Dkt. 75 at 19-25), and attaching exhibits G through I (R Dkt. 75-1 through 75-3).

Also filed on April 7, 2017, was the Affirmation of David Polak, Esq., in Support of

Plaintiffs' Motion for Summary Judgment on Serious Injury and Negligence (R Dkt. 76; B

Dkt. 59), asserting both Roth and Bauman join in Bauman's motion, as Third-Party

Defendant in the Roth Action, for summary judgment on the issue of negligence, and

attaching the Affirmation of P. Jeffrey Lewis, M.D. ("Dr. Lewis") (R Dkt. 76-1), the

Affidavit [ ][7] of Plaintiff Roth (R Dkt. 76-2), the Affirmation of Michael Hallett, M.D. ("Dr.

Hallett") (B Dkt. 59-1), and the Affidavit of Pamela Bauman (B Dkt. 59-2).  On April 7,

2017, Corporate Defendants further filed as a single document the Affirmation,

Statement of Facts, and Memorandum of Law in Suppor[t] of Defendant 2810026

Canada Limited [ ], 2810034 Canada Limited, and Frederick Group Inc.'s Opposition to

Plaintiffs Roth and Bauman's Motion for Summary Judgment (R Dkt. 77), containing the

Affirmation of Beata Shapiro, Esq. (R Dkt. 77 at 1-2), Defendant's [*sic*] Response to

Plaintiff's Statement of Undisputed Facts (R Dkt. 77 at 2-19), and a Memorandum of

Law (R Dkt. 77 at 20-38), and attaching exhibits A through N (R Dkt. 77-1 through 75-

14).[8]

Filed on April 28, 2017, were the Affirmation of David W. Polak, Esq. (R Dkt. 78),

Third-Party Defendant's Reply Memorandum of Law in Further Support of Its Motion for

Summary Judgment (R Dkt. 79), Plaintiff's exhibits A through D (R Dkts. 80-1 through

---

[7] Unless otherwise indicated, brackets and bracketed material are added.
[8] In the interest of completeness, the court notes that Corporate Defendants' Exhs. A through F do not, based on their content, appear to be the exhibits missing with regard to Corporate Defendants' exhibits filed at R Dkt. 75-1 through 75-3.  *See* n. 6, *supra*.

80-4),[9] the Attorney Affirmation of Beata Shapiro, Esq., for Reply in Support of Defendants' Motion for Summary Judgment as to Claims of Plaintiff Bauman (R Dkt. 81), attaching the Appendix of Materials in Support of Defendants' Motion for Summary Judgment as to Claims of Plaintiff Bauman (R Dkt. 81-1), and exhibits K through U (R Dkt. 81-2 through 81-11),[10] and the Attorney Affirmation of Beata Shapiro, Esq. for Reply in Support of Defendants' Motion for Summary Judgment as to Claims of Plaintiff Roth (R Dkt. 82), attaching the Appendix of Materials in Support of Defendants' Motion for Summary Judgment as to Claims of Plaintiff Roth (R Dkt. 82-1), and exhibits I through M (R Dkt. 82-2 through 82-6).[11]

Oral argument was deemed unnecessary.

Based on the following, Corporate Defendants' motion to dismiss (B Dkt. 49), should be DISMISSED as moot, and Corporate Defendants' motion for summary judgment (B Dkt. 56), should be GRANTED.

## FACTS[12]

**The Collision**

On November 9, 2011, Jeffrey Roth ("Roth"), was a front-seat passenger in a vehicle driven by Plaintiff Pamela J. Bauman ("Bauman") ("Bauman's vehicle"), in the far

---

[9] For unexplained reasons, the Affirmation of David W. Polak, Esq., previously filed as R Dkt, 78, was also filed as Dkt. R 80.

[10] The court notes that exhibits A through J were not filed.

[11] The court further notes exhibits A through H were not filed.

[12] Taken from the pleadings and relevant motion papers filed in both the Bauman and Roth Actions. Insofar as the parties may have filed other papers containing material relevant to the pending motions, but not referenced in the motion papers, "the District Court [is] 'not required to scour the record on its own in a search for evidence'" the parties failed to present on summary judgment.  *ABC v. NYU Hospitals Center*, 629 Fed.Appx. 46, 49 (2d Cir. Oct. 22, 2015) (quoting *CILP Assocs., L.P. v. PricewaterhouseCoopers LLP*, 735 F.3d 114, 125 (2d Cir. 2013)).

right-hand travel lane northbound on Interstate 190, also known as the "Niagara

Thruway" or "I-190," heading toward Niagara Falls, New York.  At the same time, an

open, flat-bed tractor-trailer owned and operated by Defendant Armajit Singh ("Singh")

("Singh's truck"), was northbound in the center travel lane of I-190.  It is undisputed that

as both Bauman and Singh traveled northbound on I-190 approaching the exit for

Niagara Street, Singh's truck and Bauman's vehicle collided ("the collision"), yet who

caused the collision, which was not witnessed by any non-parties to either the instant

action or the Roth Action is disputed.  Following the collision, both Bauman and Singh

steered their respective vehicle and truck to the right shoulder of I-190, where Roth

exited Bauman's vehicle, and Singh exited his truck and inquired whether anyone was

injured, and provided Bauman with his identification and insurance information.

Although Bauman had placed an emergency 911 telephone call, when no emergency

vehicle responded, Bauman, with Roth as a passenger, resumed driving northbound on

I-190.

### Bauman's Medical History[13]

Bauman used to clean houses part-time, but later applied for and was awarded

Social Security Disability based on depression and anxiety.  Dkt. 1 at 34; B Dkt. 56-6 at

143; R Dkt. 81-6 at 2.  On November 5, 2002, Bauman commenced treatment at

---

[13] Bauman's medical records contain many pages which appear to be treatment or progress notes for which it is not possible to discern the author of the reports. *See*, *e.g.*, B Dkt. 56-6 at 17 (noting Bauman complained on February 12, 2013 of right arm pain due following snowmobiling).  Many other pages are laboratory reports for medical conditions that are unrelated to Bauman's present medical complaints, such as hepatitis and a gall bladder condition. *See*, *e.g.*, B Dkt. 56-6 at 29-30 (appearing to be routine blood tests); B Dkt. 56-6 at 38 (treatment note dated October 11, 2011, indicating Bauman was being treated for hepatitis); B Dkt. 56-6 at 127 (treatment note dated March 8, 2010, indicating Bauman was treated for sinus congestion).  Where the author or treating source relative to the medical reports or treatment notes is indicated, it is so noted in the text; otherwise, the absence of any reference to the author or treating source for a particular medical record should be construed by the reader as indicating such information is not in the record.

Suburban Psychiatric Associates, L.L.P. ("Suburban"), with Michael P. Hallett, M.D. ("Dr. Hallett"), who is board certified in psychiatry and neurology. R Dkt. 81-2 at 2-4. Dr. Hallett performed a complete psychiatric evaluation, and diagnosed Bauman with major depressive disorder recurrent with psychotic features. *Id.*

On March 9, 2007, Bauman was examined as a new patient by Edward O'Brien, III, M.D. ("Dr. O'Brien"), a Board Certified Psychiatrist. R Dkt. 77-2; B Dkt. 56-6 at 155-56. At that time, Bauman's self-reported symptoms included depression, pain, weakness and numbness in her arms and shoulders, stomach pain, and hay fever, and Plaintiff reported receiving psychiatric care for depression and anxiety for which Bauman had been admitted for treatment to BryLin Hospital in 2001. *Id.* Dr. O'Brien referred Bauman to Suburban Psychiatric Associates, L.L.P. ("Suburban"), for depression and anxiety. *Id.* at 143.

On February 19, 2008, when Bauman was examined at Suburban by Dr. Hallett, Bauman reported fewer symptoms of depression and anxiety, and was working as a house cleaner three mornings a week, which was all Bauman could handle. B Dkt. 56-6 at 143; R Dkt. 81-6 at 2. Bauman was diagnosed with major depressive disorder, recurrent and unspecified, was prescribed Cymbalta, Wellbutrin, and Xanax, was to taper off Zoloft, was referred for counseling with Laurie LaPorta, as needed, and was to return to Suburban in one month. B Dkt. 56-6 at 144; R Dkt. 81-6 at 3.

On February 13, 2009, Dr. Hallett reported Bauman had fewer symptoms of depression and anxiety, and her medications included Zoloft, Cymbalta, Wellbutrin, and Xanax. R Dkt. 81-6 at 4-5. Bauman was again diagnosed with major depressive disorder, recurrent and unspecified. *Id.* at 5.

On January 13, 2010, Bauman complained to Dr. O'Brien of neck pain for which she saw a chiropractor in April, and for which Dr. O'Brien prescribed Flexeril (muscle relaxant).  B Dkt. 56-6 at 141.  Bauman also complained of a left rotator cuff condition for which Dr. O'Brien prescribed a non-steroidal anti-inflammatory drug ("NSAID").  *Id.* at 142.

At an examination with Dr. Hallett on January 18, 2010, in addition to reporting fewer symptoms of anxiety and depression, Bauman also mentioned having hurt her back in June 2009.  B Dkt. 56-6 at 137-39; R Dkt. 81-6 at 6-8.  Bauman also discussed problems with her marriage, including that her husband could be "clingy," "yells," displays anger and "road rage," and that Bauman was thinking of leaving her husband, and had an affair.  *Id.*

On May 9, 2011, Dr. Hallett again diagnosed Bauman with major depressive disorder, recurrent and unspecified, and her medications included Zoloft, Xanax, Klonopin, and a sample of Cymbalta.  R Dkt. 81-4 at 2-5.

On July 25, 2011, Bauman was examined by Caitlin Lafferty, ANP, for complaints of muscle spasms in her neck and back attributed to stress and anxiety.  R Dkt. 77-12 at 4.  Bauman reported back and neck pain, and knots in her back, all of which were relieved with Flexeril and massage.  *Id.*   Blood work on September 30, 2011 was positive for Lyme Disease antibody.  *Id.*

Following the November 9, 2011 collision, Bauman waited five days before being seen at Suburban where Bauman reported to her therapist she "was okay" and "not hurt."  R. Dkt. 81-6 at 9.  At that time, Bauman's medications included Zoloft, Cymbalta, Wellbutrin, Xanax, and Klonopin.  *Id.* at 10.

On April 17, 2012, Bauman complained to Dr. O'Brien of generalized arthralgia particularly in her neck and left arm.  B Dkt. 56-6 at 27.  Dr. O'Brien determined Bauman had either a cervical spine condition or carpal tunnel syndrome.  *Id.* at 28.

On June 4, 2012, Bauman reported to Dr. Hallett she was "good."  R Dkt. 81-11 at 2.  Bauman's medications included Zoloft, Xanax, Klonopin, and samples of Cymbalta.  *Id.* at 4, 6.  Bauman's diagnosis remained major depressive disorder, recurrent and unspecified.

As of December 7, 2012, Bauman received treatment from Dr. Hallett for Major Depressive Disorder Recurrent Unspecified.  B Dkt. 56-5 at 21.

On December 28, 2012, Bauman, who had complained of left foot pain for several months, underwent an imaging study[14] of her left foot which showed no fractures but a small, 5 mm calcaneal spur.  B Dkt. 56-5 at 22.

On February 12, 2013, Bauman complained of right arm pain after a snowmobiling accident.  B Dkt. 56-6 at 17.  Dr. O'Brien diagnosed Bauman with an injury to her right shoulder and lumbosacral spine, for which Flexeril and Motrin were prescribed, and imaging tests were ordered.  *Id.* at 17-18.  That same day, Bauman underwent at Mercy Hospital of Buffalo diagnostic imaging of her right shoulder and lumbosacral spine in connection with right shoulder and lower back pain following the snowmobile accident three days earlier.  B Dkt. 56-11 at 2-3.  The imaging was negative with regard to Bauman's right shoulder, but showed moderate degenerative arthritis in the lumbar spine and constipation.  *Id.*

---

[14] The record does not indicate the specific type of imaging study.

On April 2, 2013, Bauman was evaluated by Physical Therapist Jillian Chwojdak ("PT Chwojdak"), at Buffalo Rehab Group for complaints of constant ache in her right shoulder blade and neck pain radiating down her arm to her fingers with intermittent numbness from her shoulder to fingers.  B Dkt. 56-6 at 6.  Bauman's pain fluctuated between 2 and 8 on a scale of 10, *id.*, and began February 10, 2013 when Bauman went over a big hill while snowmobiling.  *Id.*  At that time, Bauman worked part-time with restrictions to reaching overhead, pulling, carrying items, reaching across her body, driving more than 30 minutes, scrubbing less than five minutes, vacuuming, laundry, playing games on her phone, lying on her right shoulder, turning her head to the left, looking up and down, and reaching behind her head and back.  *Id.*

On April 13, 2013, Bauman received a cortisone shot in her right shoulder and a physical therapy evaluation for back pain was ordered.  B Dkt. 56-6 at 9-10.  Bauman reported steroids helped her pain.  *Id.*

On June 24, 2013, Bauman presented to Urgent Care in Batavia, New York with complaints of acute exacerbation of chronic lower back pain, which Bauman attributed to a motor vehicle accident in 2011, maintaining she had experienced a sharp pain in her lower back while walking through a department store a few days earlier.  B Dkt. 1 at 45-46.  Bauman saw her chiropractor the next day, which provided some relief, but was unable to see a medical doctor until July 15, 2013.  *Id.* at 46.  Bauman was diagnosed with a sprain in her lumbar spine.  *Id.* at 50.

On May 19, 2014, Bauman reported to Dr. Hallett that she was "better" and had commenced Zumba classes.  R Dkt. 81-8 at 2-3.  At that time, Bauman's medications included Zoloft, Xanax and Klonopin, and Bauman remained diagnosed with major

depressive disorder, recurrent and unspecified, but was also diagnosed with adjustment disorder with mixed anxiety/depression, and relationship problems.  *Id.* at 7-8.

On July 16, 2014, Bauman again stated she was "better," R. Dkt. 81-8 at 9, her medications included Klonopin, Xanax, and Zoloft, *id.* at 10, Bauman had discontinued attending Zumba classes, which were too expensive, and instead was riding her bicycle, *id.*, and Bauman was again diagnosed with major depressive disorder, recurrent and unspecified, but was also diagnosed with adjustment disorder with mixed anxiety/depression, and relationship problems.  *Id.* at 15.

An October 8, 2014 MRI of Bauman's lumbar spine by Kevin Gibbons, M.D. ("Dr. Gibbons"), showed central L5-S1 disc herniation impinging on the anterior aspect of the thecal sac, and mild facet arthropathy involving the lower lumbar spine without evidence of foraminal stenosis.  B Dkt. 1 at 38; repeated at B Dkt. 56-8 at 18.

An MRI of Bauman's cervical spine taken December 9, 2014, upon referral by Dr. Gibbons, showed desiccated central C5-6 herniation indenting the anterior aspect of the thecal sac, left-sided C4-5 disc herniation indenting the anterior aspect of the thecal sac, disc space narrowing, disc desiccation, concentric bulging of the disc, and minimal posterior osteophytes at the C6-7 level which indent the anterior aspect of the thecal sac without impinging on the cervical cord and no other sites of cervical disc herniation or cervical spinal stenosis or cervical cord compression, and uncovertebral osteophytes producing mild bilateral C6-7 and mild bilateral C5-6 foraminal stenosis.  B Dkt. 1 at 37; repeated at B Dkt. 56-8 at 17.

On May 19, 2015, Bauman reported being "o.k." to Dr. Hallett.  R Dkt. 81-9 at 2. Bauman remained diagnosed with major depressive disorder, recurrent and

unspecified, Bauman's depression and anxiety had improved and were rated as "mild in severity," and her medications included Klonopin, Xanax, and Zoloft. *Id.* at 3, 8-9.

On June 2, 2015, Bauman underwent a three-level anterior cervical discectomy and fusion at C4-C7, performed by Dr. Gibbons. R Dkt. 77-12 at 3; B Dkt. 56-8 at 9. Following the cervical spinal fusion, Bauman reported "her low back pain felt immediately better." B Dkt. 56-8 at 9. When Bauman was next seen by Dr. Gibbons on June 18, 2015, Bauman complained of right-sided neck pain and bilateral shoulder and arm pain with tingling sensations in her arms and legs. R Dkt. 77-12 at 3. Because Bauman had difficulty raising her right arm, Dr. Gibbons advised Bauman to seek an orthopedic surgeon regarding her right shoulder and Bauman consulted Dr. Landfried. *Id.* On July 28, 2015, Bauman underwent a right shoulder MRI arthrogram that revealed an anterior labral tear with a Type II SLAP lesion but no rotator cuff tear. *Id.* In August 2015, Dr. Landfried performed arthroscopic surgery on Bauman's right shoulder. *See id.*[15] At a follow-up with Dr. Landfried on November 20, 2015, Bauman reported doing better, but she still had some pain and was advised to attend physical therapy. *Id.* Bauman did attend several physical therapy sessions at Summit Physical Therapy, but when she stopped, her symptoms returned. *Id.*

On February 10, 2016, Bauman reported to Dr. Hallett she was "alright." R Dkt. 81-10 at 2. Bauman's medications included Klonopin, Xanax, and Zoloft, *id.* at 3, and Bauman was diagnosed with depression and anxiety, both of which had improved and

---

[15] The court notes no records from Dr. Landfried are in the record relative to the pending motions, and the court's reference to Dr. Landfried's treatment of Bauman is taken from the report of Defendants' expert witness, Dr. Leddy.

were "[r]ated as mild in severity," *id.* at 5, and "in partial remission," *id.* at 10, as well as adjustment disorder with mixed anxiety and depressed mood, unspecified. *Id.*

For approximately one year, Bauman continued to do well, but her symptoms "flared up" in May 2016, and on June 15, 2016, Bauman attended physical therapy at Summit Physical Therapy, where her chief complaint was low back pain with radiculopathy into bilateral lower extremities. B Dkt. 56-8 at 9. For the first time in Bauman's medical records filed in connection with the instant motion, Bauman attributes the source of her pain to the November 9, 2011 collision. *Id.* Bauman was observed to have no general gait deviations and used no assistive devices. *Id.* at 10. Upon examination by physical therapist James Turner ("PT Turner"), Bauman was assessed with hypomobility of the lumbar spine from L2-L5, with complaints of pain with repeated mobilizations of the spinal segments and left rotated lumbar vertebrae at the same levels. *Id.* at 11. Bauman was instructed in different stretching and strengthening exercises with stabilization exercises planned for future incorporation. *Id.* PT Turner thought normal flexibility of the lumbar spine could be restored with decreased left rotation which should eliminate Bauman's back pain, and Bauman's rehabilitation potential was excellent. *Id.* Bauman was to attend physical therapy twice a week for four weeks. *Id.* at 12.

A July 20, 2016 physical therapy progress note indicates Bauman continued to complain of pain radiating down her right leg approximately to her right knee. B Dkt. 56-8 at 13. Less frequently, Bauman experienced similar symptoms on the left side. *Id.* The symptoms could be "quite debilitating" with standing and walking, and Bauman reported increased discomfort after her last physical therapy visit despite feeling "good"

with lumbar mobilizations.  *Id.*  Upon examination, Bauman was assessed with S1 involvement which was not previously observed and S1 joint mobilizations and lumbar traction were to be incorporated into Bauman's physical therapy.  *Id.*  Bauman's prognosis was reported as "good."  *Id.*

A July 27, 2016 physical therapy progress note indicates Bauman's pain continued to persist, radiating across her low back into her right hip and down her right lateral leg to the right knee.  B Dkt. 56-8 at 15.  Compensating for the pain often resulted in left hip pain and Bauman's symptoms interfered with her ability to sleep.  *Id.* Bauman occasionally had numbness in her right leg lasting a minute or two, but the numbness ceased when Bauman changed position.  *Id.*  Bauman's daily activities were limited by pain, and Bauman could sit or stand for only five minutes.  *Id.*  Bauman reported the physical therapy did not provide any lasting relief and was not "really helping."  *Id.*  After physically examining Bauman, PT Turner noted that Bauman, who had attended physical therapy for five weeks, was not experiencing any lasting relief and recommended further neurological workup before pursuing any further physical therapy.  *Id.* at 15-16.

On August 3, 2016, Bauman was seen by P. Jeffrey Lewis, M.D. ("Dr. Lewis"), at Buffalo Neurosurgery Group, complaining of lower back pain radiating into her hip and down her leg to the knee, and heaviness in her hips.  B Dkt. 56-8 at 4.  Bauman was referred for physical therapy.  *Id.*

An MRI of Bauman's lumbar spine taken August 16, 2016, upon referral by Dr. Lewis, showed central L5-S1 disc herniation indenting the anterior aspect of the thecal sac which is slightly increased in size from the prior examination, disc space narrowing,

concentric bulging and annular tears at the L2-3 level with no other sites of lumbar disc herniation or acute spine compression, and 3 mm of retrolisthesis of L6 on S1.  B Dkt. 56-8 at 3.

In a report by Defendants' expert witness, John Leddy, M.D. ("Dr. Leddy"), Professor of Clinical Orthopedics and Rehabilitation Services, dated December 15, 2016, R Dkt. 77-12 at 2-5, concluded, based on the medical evidence in the record, that there is no evidence Bauman sustained any injury as a direct result of the November 9, 2011 collision especially given that Bauman, both five days after the collision and on February 3, 2012, reported to her therapist at Suburban that she was not hurt as a result of the collision.  *Id.* at 4.  Dr. Leddy also noted a "very significant gap in [Bauman's] evaluation and treatment" and that "[m]edical records from before the accident document that [Bauman] had a history of multiple musculoskeletal complains in her neck, back and shoulders that required medication and treatment prior to 11/9/11. . . " as well as "evidence of Lyme Disease, which produces chronic arthraligias and musculoskeletal pain and is responsible for her current symptoms."  *Id.* at 4-5.  Dr. Leddy noted Bauman's "cervical fusion was performed for chronic degenerative cervical disc and bone disease, not for any injury related to the [collision]."  *Id.* at 5.  According to Dr. Leddy, with regard to the collision, no medical evidence established Bauman had any medical symptom, disability, limitation or permanency, nor did Bauman require any ongoing or future medical or surgical treatment, and her prognosis "was and is good."  *Id.*

On April 4, 2017, Dr. Hallett provided a report stating he had been treating Bauman since prior to the collision.  B Dkt. 59-1 at 1.  According to Dr. Hallett, Bauman

did not immediately seek treatment for neck, back or shoulder injuries allegedly caused

by the collision because one of the medications Bauman had been taking for her

depression and anxiety disorders, Cymbalta, has a pain relieving component which

would have masked the pain from the injuries sustained in the collision, thereby

explaining Bauman's delay in seeking treatment for such injuries.  *Id.* at 1-2.  It is Dr.

Hallett's opinion that the progressive nature of Bauman's physical injuries sustained in

the collision eventually led Bauman to seek more aggressive treatment.  *Id.*  Dr. Hallett

further opined that the collision caused Bauman to experience increased anxiety and

depression especially given that Bauman has had to decrease her daily activities, and is

limited in her physical and social activities.  *Id.* at 3-4.


## DISCUSSION

### 1.    Summary Judgment

Corporate Defendants move for summary judgment arguing Bauman did not

sustain a "serious injury" as defined under N.Y. Ins. Law § 5102(d) ("§ 5102(d)").[16]  B

Dkt. 56-1, *passim*.  Summary judgment of a claim or defense will be granted when a

moving party demonstrates that there are no genuine issues as to any material fact and

that a moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) and

(b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 250-51 (1986); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300

(2d Cir. 2003).  The court is required to construe the evidence in the light most favorable

to the non-moving party.  *Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011).  The

---

[16] Unless otherwise indicated, references to N.Y. Ins. Law are to McKinney 1984.

party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment. *Celotex*, 477 U.S. at 322; *see Anderson*, 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").  "A fact is material if it 'might affect the outcome of the suit under governing law.'"  *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).  Here, summary judgment may be granted in favor of Corporate Defendants only if the record establishes that none of Bauman's injuries is serious as defined under § 5102(d).

"[T]he evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988)).  A defendant is entitled to summary judgment where "'the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on'" an essential element of a claim on which the plaintiff bears the burden of proof.  *In re Omnicom Group, Inc., Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (quoting *Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir. 1992)).  Once a party moving for summary judgment has made a properly supported showing of the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor. *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).  "[F]actual issues created

solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes v. New York City Department of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996). "An issue of fact is genuine and material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Cross Commerce Media, Inc. v. Collective, Inc.*, 841 F.3d 155, 162 (2d Cir. 2016) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133,137 (2d Cir. 2009)).

In this tort action, because the collision occurred in New York, New York law applies, *Lee v. Bankers Trust Co.*, 166 F.3d 540, 545 (2d Cir. 1999) (in tort action, New York law applies the law of the place of the tort), and the parties do not argue otherwise.

## 2.    Failure to Comply with Local Rule 56

Preliminarily, the court considers Corporate Defendants' arguments that Bauman's failure to comply with Local Rule of Civil Procedure 56(a) ("Local Rule 56(a)"), in failing to submit in response to Corporate Defendants' statement of undisputed fact a statement specifically refuting such facts in opposing Corporate Defendants' summary judgment motion, R Dkt. 81 at 2-3, which Bauman does not dispute, requires deeming admitted the statement of facts Corporate Defendants submitted in support of their summary judgment motion. Pursuant to Local Rule 56(a)(1), a summary judgment motion filed under Fed.R.Civ.P. 56 must be accompanied by

> a separate, short, and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried. Each such statement must be followed by citation to admissible evidence as required by Fed.R.Civ.P. 56(c)(1)(A). Citations shall identify with specificity the relevant page and paragraph or line number of the evidence cited. Failure to submit such a statement may constitute grounds for denial of the motion.

Local R. Civ. P. – W.D.N.Y. Rule 56(a)(1).

Additionally,

> The papers opposing a motion for summary judgment shall include a response to each numbered paragraph in the moving party's statement, in correspondingly numbered paragraphs and, if necessary, additional paragraphs containing a short and concise statement of additional material facts as to which it is contended there exists a genuine issue to be tried.  Each numbered paragraph in the moving party's statement of material facts may be deemed admitted for purposes of the motion unless it is specifically controverted by a correspondingly numbered paragraph in the opposing statement.

Local R. Civ. P. – W.D.N.Y. Rule 56(a)(2).

Although the court does not condone Bauman's noncompliance with Rule 56(a), "[a] local rule imposing a requirement of form must not be enforced in a way that causes a party to lose any right because of a nonwillful failure to comply."  Fed.R.Civ.P. 83(a)(2); *Buck v. Cleary*, 345 Fed.Appx. 660, 662 (2d Cir. Sept. 14, 2009) (finding district court abused discretion in deeming admitted defendants' statement of material facts based on plaintiff's failure to separately respond to each stated fact as required under applicable local rule, vacating lower court's decision to do so in the absence of any evidence that the failure to comply was willful, and remanding that portion of the judgment based on such deemed admitted facts).  Similarly, nothing in the instant record establishes, or even suggests, Bauman's failure to formally comply with Local Rule 56(a)(1) and (2) was willful.  Accordingly, despite Bauman's undisputed failure to comply with Local Rule 56(a)(1) and (2), the court, in the exercise of its discretion, should neither deny summary judgment to Bauman, nor deem admitted Corporate Defendants' statement of undisputed facts.

3.    **Serious Injury**

As stated, Corporate Defendants seek summary judgment on the issue of whether Bauman sustained a serious injury under § 5102(d).  To obtain summary judgment on their motion on Bauman's serious injury claim under § 5102(d), Corporate Defendants' initial burden is establishing by competent medical evidence that Bauman did not sustain such a "serious injury" within the meaning of § 5102(d).  *See Yong Qin Luo v. Mikel*, 625 F.3d 772, 777 (2d Cir. 2010) (recognizing threshold issue on defendant's summary judgment motion on § 5102(d) serious injury claim is whether the plaintiff sustained a serious injury within the meaning of § 5102(d) (citing *Licari v. Elliott*, 441 N.E.2d 1088 (N.Y. 1982))).  In contrast, to avoid summary judgment Bauman must establish, by competent medical evidence, a genuine issue of material fact exists as to whether she sustained such an injury.  *See McHugh v. Marfoglia*, 885 N.Y.S.2d 550, 551 (4th Dep't 2009) (reversing lower court's denial of plaintiff's partial summary judgment motion on threshold issue of serious injury where plaintiff's objective medical evidence showed plaintiff suffered spine injury requiring surgery and resulting in permanent loss of ranger of motion (citing *Toure v. Avis Rent A Car Sys.*, 774 N.E.2d 1197, 1201-02 (2002))).  In attempting to establish the plaintiff's injuries are not serious within the meaning of § 5102(d), a defendant can rely on "the affidavits or affirmations of medical experts who have examined the plaintiff and concluded that no objective medical findings support the plaintiff's claim."  *Grossman v. Wright*, 707 N.Y.S.2d 233, 237 (2d Dep't 2000).  Although generally, a physician's opinion is admissible as evidence only "when subscribed and affirmed by him to be true under penalties of perjury," N.Y.Civ.Prac.L.&R 2106(a), the defendant may rely on unsworn medical

records provided by the plaintiff to the defendant, although in doing so, the defendant opens the door for the plaintiff to also rely upon the same, unsworn records in opposing summary judgment.  *Kearse v. New York City Transit Authority*, 789 N.Y.S.2d 281, 283-84 & n. 1 (2d Dep't 2005) (citing cases).  *See also Yong Qin Luo*, 625 F.3d at 777 (in establishing its *prima facie* case, a defendant may rely upon the plaintiff's unsworn treatment records, but to rebut the defendant's showing, the plaintiff must provide affidavits, affirmations or other sworn statements).  Upon establishing such a *prima facie* case, the burden shifts to the opposing party to point to evidence showing a genuine issue of material fact on this issue.  *Licari*, 441 N.E.2d at 1091.  Furthermore, the "[p]laintiff must present objective proof of injury, as subjective complaints of pain will not, standing alone, support a claim for serious injury."  *Yong Qin Luo*, 625 F.3d at 777.

In support of their summary judgment motion, Corporate Defendants argue that Bauman's injuries do not constitute a "serious injury" under § 5102(d), B Dkt. 56-1 at 1-2, based on Bauman's failure, for more than one year after the collision, to seek medical treatment for her neck, back, and shoulder injuries, which gap Corporate Defendants maintain is fatal to Bauman's claims, *id*. at 9-13, and because Bauman is unable to establish the requisite causal connection between her injuries and the collision.  *Id*. at 13-15.  In opposition, Bauman acknowledges Dr. O'Brien "did not keep very detailed records of his office visits [with Bauman]," B Dkt. 59 ¶ 25, and never sent Bauman for any diagnostic imaging tests, *id*., but relies on Dr. Hallett's articulation that while in his care, including at the time of the collision, Bauman was prescribed Cymbalta, which has a pain relieving benefit that "was likely masking the ongoing pain Ms. Bauman was experiencing until it progressed so much that further medical intervention was

necessary," *id.* ¶¶ 26-27, and asserts the February 2013 snowmobiling accident merely exacerbated Bauman's underlying injuries to her neck, right shoulder and lower back. *Id.* ¶ 29.  In further support of summary judgment, Corporate Defendants argue Dr. Hallett's Affirmation is inadmissible because Bauman failed to timely disclose Dr. Hallett as an expert witness, R Dkt. 81 at 1-2*id.* at 3-4; Bauman is unable to establish the requisite causal connection between her injuries and the collision, *id.* at 4-5; Dr. Hallett never physically examined Bauman and, as such, is unable to opine as to her physical injuries, *id.* at 5-7; Bauman's affidavit submitted in opposition to summary judgment is inconsistent with her medical records, *id.* at 7-8; Bauman cannot satisfy the serious injury criteria under the 90/180 day category,[17] *id.* at 8-10; and Bauman has failed to reference any caselaw rebutting Corporate Defendants' arguments on summary judgment.  *Id.* at 10.

Under New York's Comprehensive Automobile Insurance Reparations Act, commonly known as the "No-Fault Insurance Law," automobile owners in New York are required to carry automobile insurance compensating injured parties for "basic economic loss" caused by the use or operation of the automobile within New York, regardless of fault.  *Pommells v. Perez*, 830 N.E.2d 278, 280 (N.Y. 2005) (citing N.Y. Ins. Law §§ 5102[a], 5103).  Under the No-Fault Law, a plaintiff may not recover for basic economic losses such as unreimbursed medical expenses, lost wages or property damage unless such losses exceed $ 50,000.  N.Y. Ins. Law § 5102(a).  Further, "[o]nly in the event of 'serious injury' as defined in the statute, can a person initiate suit against

---

[17] Under the "90/180 category" of serious injury, the injury must have been caused by the accident and must have greatly prevented the plaintiff from performing her usual activities for at least 90 of the 180 days immediately following the accident.  *Escoto v. United States*, 848 F.Supp.2d 315, 330 (E.D.N.Y. 2012).

the car owner or driver for damages caused by the accident." *Id.* (quoting N.Y. Ins. Law § 5104[a]). As such, "No-Fault thus provides a compromise: prompt payment for basic economic loss to injured persons regardless of fault, in exchange for a limitation on litigation to cases involving serious injury." *Id.* (underlining added; citing *Montgomery v. Daniels*, 340 N.E.2d 444 (N.Y. 1975)).

"By enacting the No-Fault Law, the Legislature modified the common-law rights of persons injured in automobile accidents to the extent that plaintiffs in automobile accident cases no longer have an unfettered right to sue for injuries sustained." *Licari*, 441 N.E.2d at 1091 (citing *Montgomery v. Daniels*, 340 N.E.2d 444, 453-54 (N.Y. 1975). In particular,

> Notwithstanding any other law, in any action by or on behalf of a covered person against another covered person for personal injuries arising out of negligence in the use or operation of a motor vehicle in this state, there shall be no right of recovery for non-economic loss, except in the case of a serious injury, or for basic economic loss.

N.Y. Ins. Law § 5104(a) ("§ 5104(a)").

"Thus, to the extent that the Legislature has abrogated a cause of action, the issue is one for the court, in the first instance where it is properly raised, to determine whether the plaintiff has established a prima facie case of sustaining serious injury." *Licari*, 441 N.E.2d at 1091. As such, it "is incumbent upon the court to decide in the first instance whether plaintiff has a cause of action to assert within the meaning of the statute," *id.*, and "[i]f it can be said, as a matter of law, that plaintiff suffered no serious injury within the meaning of [§ 5102(d)], then plaintiff has no claim to assert and there is nothing for the jury to decide." *Id.* at 1092.

As relevant, a "serious injury" is defined as

A personal injury which results in death; dismemberment; significant disfigurement; a fracture; loss of a fetus; permanent loss of use of a body organ, member, function or system; permanent consequential limitation of use of a body organ or member; significant limitation of use of a body function or system; or a medically determinable injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment.

N.Y. Ins. Law § 5102(d).

"There can be little doubt that the purpose of enacting an objective verbal definition of serious injury was to 'significantly reduce the number of automobile personal injury accident cases litigated in the courts, and thereby help contain the no-fault premium.'" *Licari*, 441 N.E.2d at 1091 (quoting Memorandum of State Executive Dep't, 1977 McKinney's Session Laws of N.Y., p. 2448). "While it is clear that the Legislature intended to allow plaintiffs to recover for noneconomic injuries in appropriate cases, it had also intended that the court first determine whether or not a prima facie case of serious injury has been established which would permit a plaintiff to maintain a common-law cause of action in tort." *Id.* (citing cases).

Accordingly, in the instant case, to establish a "serious injury," Bauman must submit medical evidence demonstrating at least one of the nine categories of serious injury specified under § 5102(d). Here, Bauman specifies that her injuries meet three of § 5102(d)'s nine categories of serious injury, including (1) a significant limitation of use of a body function or system; (2) permanent consequential limitation of use of a body organ or member; and (3) medically determined injury or impairment of a non-permanent nature which prevented Bauman from performing substantially all of the

material acts constituting his usual and customary daily activities for at least 90 of the 180 days immediately following the collision.  B Dkt. 59 at 6, ¶ 36.

In general, Bauman seeks to recover for injuries to her neck, shoulders, and back with radiculopathy.[18]  The court examines whether the filed medical records would support a reasonable jury's finding that any of these injuries Bauman allegedly suffered qualifies as a serious injury under any one of the four categories on which Bauman relies.

### A.    Adequacy and Disclosure of Dr. Hallett's Affirmation

Preliminarily, the court addresses Corporate Defendants' contention that Dr. Hallett's Affirmation is inadmissible because Dr. Hallett was not timely identified under Fed.R.Civ.P. 26(a)(2)(C) as an expert witness requiring such medical evidence be stricken under Fed.R.Civ.P. 37(c)(1).  R Dkt. 81 at 3-4.  According to Corporate Defendants, although the disclosure of a treating physician, like Dr. Hallett, as an expert

---

[18] In particular, the various injuries Bauman alleges resulted from the collision include:
- neck, shoulder and pack pain and injuries with radiculopathy;
- upper and lower extremity radiculopathy;
- C5-6 herniation indenting the thecal sac;
- C4-5 herniation indenting the thecal sac;
- C6-7 herniation/bulge indenting the thecal sac;
- C5-6 and C6-7 bilateral foraminal stenosis;
- L5-S1 herniation impinging on the thecal sac;
- L4-5 bulge;
- cervicalgia;
- lumbago;
- cervicalgia;
- myelopathy;
- neuralgia, neuritis and radiculitis;
- intervertebral disc displacement; and
- need for anterior cervical discectomy and fusion C4-5, C5-6 and C6-7 with four (4) level anterior plating and use of allograft bone.

B Dkt. 56-9 at 8-9; B Dkt. 56-10 at 5.

Further, despite a plethora of medical records indicating Bauman has been diagnosed with depression and anxiety disorders, Bauman has not alleged serious injury based on such conditions.

need not be accompanied by an expert witness report otherwise required under Fed.R.Civ.P. 26(a)(2)(B), such disclosure nevertheless must provide, pursuant to Fed.R.Civ.P. 26(a)(2)(C) ("Rule 26(a)(2)(C)"), "the subject matter on which the witness is expected to present evidence," and "a summary of the facts and opinions to which the witness is expected to testify."  R Dkt. 81 at 3.  Corporate Defendants further maintain that Bauman's failure to comply with Rule 26(a)(2)(C) requires the court limit its consideration of Dr. Hallett's opinion to Dr. Hallett's treatment of Bauman, such that Dr. Hallett may not opine as to matters beyond his own treatment of Bauman.  *Id.*  Bauman has not responded to this argument.

Corporate Defendants' request to limit consideration of Dr. Hallett's Affirmation solely to Dr. Hallett's actual treatment of Bauman based on Bauman's failure to timely disclose Dr. Hallett as an expert is premised on "the distinction between witnesses who will offer expert testimony because of their treatment of plaintiff and those witnesses who will offer expert testimony because they have been retained or specifically employed to provide such testimony."  *Franz v. New England Disposal Technologies, Inc.*, 2011 WL 5443856, at * 1 (W.D.N.Y. Nov. 9, 2011).  "Although not required to provide a written report under Rule 26(a)(2)(B), a party seeking to use a treating physician must disclose more than just the identity of the treating physician."  *Barack v. American Honda Motor Co., Inc.*, 293 F.R.D. 106, 108 (D.Conn. 2013).  Specifically, "if the witness is not required to provide a written report [under Rule 26(a)(2)(B), the witness's] disclosure must state: (i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify."

Fed.R.Civ.P. 26(a)(2)(C).  "Rule 26(a)(2)(C) therefore clearly requires treating physicians to, at a minimum, produce and disclose 'summaries' of the facts and opinions to which the physician expects to testify."  *Barack*, 293 F.R.D. at 108. (citing cases).

That "Rule 26 uses the term 'expert' to refer to individuals who will testify under Rule 702 of the Federal Rules of Evidence with respect to scientific, technical, and other specialized matters, but recognizes that the requirement of a written report 'applies only to those experts who are retained or specially employed to provide such testimony in the case or whose duties as an employee of the party regularly involve the giving of such testimony,'" *Franz*, 2011 WL 5443856, at * 2 (quoting Fed.R.Civ.P. 26, Advisory Committee Notes, 1993 Amendment), was reiterated in the 2010 Advisory Committee Notes as follows:

> A witness who is not required to provide a report under Rule 26(a)(2)(B) may both testify as a fact witness and also provide expert testimony under Evidence Rule 702, 703, or 705.  Frequent examples include physicians or other health care professionals and employees of a party who do not regularly provide expert testimony.  Parties must identify such witnesses under Rule 26(a)(2)(A) and provide the disclosure required under Rule 26(a)(2)(C).  The (a)(2)(C) disclosure obligation does not include facts unrelated to the expert opinions the witness will present.

Rule 26(a)(2), thus "'clearly contemplates a general category of persons who will give expert testimony . . and a subcategory of persons who are specifically retained to give expert testimony.'"  *Franz*, 2011 WL 5443856, at * 2 (quoting *Lamere v. New York State Office for the Aging*, 2004 WL 1592669, at * 1 (N.D.N.Y. 2004)).

In the instant case, Bauman does not dispute failing to timely disclose Dr. Hallett as an expert in accordance with Rule 26(a)(2).  In failing to disclose in compliance with Rule 26(a)(2)(C), the party is subject to the imposition of sanctions pursuant to Rule

37(c)(1), including, as relevant here, preclusion from relying on that witness's testimony "unless the failure was substantially justified or harmless."  Fed.R.Civ.P. 37(c)(1).  "Rule 37(c) is designed to prevent the 'sandbagging' of an opposing party with new evidence." *Piccone v. Town of Webster*, 2011 WL 3322550, at * 5 (W.D.N.Y. Aug. 2, 2011) (quoting *CSC Holdings, Inc. v. Berube*, 2004 WL 3541331, at *3 (E.D.N.Y. July 7, 2004) (Rule 37(c)(1) is "designed to avoid . . . gamesmanship . . . [and] . . . 'to provide a strong inducement for disclosure of Rule 26(a) material.'" (quoting *Hein v. Cuprum, S.A. de C.V.*, 53 Fed.Appx. 134, 136 (2d Cir. 2002)))).  The severity of exclusion under Rule 37(c)(1) "is softened by the proviso that the penalty should not apply if the offending party's failure to disclose was 'substantially justified.'"  *Id.* (quoting *Berube*, 2004 WL 3541331 at * 3).  Nevertheless, "[e]ven if 'the failure was not substantially justified the exclusion should not apply if the failure was harmless.'"  *Id.*

Here, permitting full consideration of Dr. Hallett's expert opinion is significant insofar as Dr. Hallett attributes the gap in Bauman's seeking treatment for her neck, back on shoulder injuries to the fact that Dr. Hallett, prior to the collision, had prescribed for Bauman's depression Cymbalta which has pain relieving properties which may have masked Bauman's symptoms she later attributed to the alleged injuries.  There are, however, three reasons to limit the court's consideration of Dr. Hallett's Affirmation to Dr. Hallett's care of Bauman.  First, Dr. Hallett's treatment of Bauman was limited to psychiatric care, with absolutely no indication that Dr. Hallett ever treated Bauman in connection with her alleged neck, back and right shoulder injuries, rendering Dr. Hallett's statement attributing a possible masking of pain relative to such injuries to Bauman's use of Cymbalta without any medical competence with respect to Bauman's

alleged musculoskeletal problems.  *See Franz*, 2011 WL 5443856, at * 2 (holding that as a consequence of personal injury plaintiff's untimely disclosure of treating physician as expert witness, the physician was "precluded from rendering opinion based upon information obtained outside the course of treatment and <u>beyond</u> <u>the</u> <u>reasonable</u> <u>reading</u> <u>of</u> <u>the</u> <u>providers'</u> <u>medical</u> <u>records</u>." (citing *Lamere v. New York States Office for the Aging*, 223 F.R.D. 85, 89 (N.D.N.Y. 2004), *aff'd*, 2004 WL 1592669 (N.D.N.Y. July 14, 2009))).  Second, although Bauman first presented Dr. Hallett's Affirmation, dated April 4, 2017, in connection with Bauman's opposition to summary judgment, filed April 7, 2017, more than five months after the deadline for disclosing expert witnesses, *see* Second Amended Scheduling Order filed October 17, 2016 (B Dkt. 37) at 1, ¶ 3 (setting October 28, 2016 as Bauman's deadline for identifying expert witnesses), Bauman has provided no explanation, much less an explanation establishing the failure to timely disclose Dr. Hallett as an expert was substantially justified.  Moreover, given the nature of Dr. Hallett's anticipated testimony, as revealed in his Affirmation, depriving Corporate Defendants of an opportunity to pursue the likelihood that Bauman's use of Cymbalta "masked" the symptoms of her alleged collision-related injuries cannot be considered harmless.

Accordingly, as a consequence of Bauman's failure to timely disclose Dr. Hallett as an expert witness, Dr. Hallett thus is "precluded from rendering opinion based upon information obtained outside the course of treatment and <u>beyond</u> <u>the</u> <u>reasonable</u> <u>reading</u> <u>of</u> <u>the</u> <u>providers'</u> <u>medical</u> <u>records</u>."  *Franz*, 2011 WL 5443856, at * 2.  In other words, Dr. Hallett may opine as to the cause of Bauman's medical condition, her prognosis and the extent of any disability caused by the alleged injuries, so long as that

opinion is based upon Dr. Hallett's medical care and treatment of Bauman which was limited to psychiatric care, but Dr. Hallett may not testify as to opinions that are not gleaned from his own diagnosis and treatment of Bauman.  *Id.*  As such, Dr. Hallett's affirmation is stricken insofar as Dr. Hallett opines on matters beyond his treatment of Bauman, which was limited to her major depressive disorder and anxiety, but may not opine regarding any analgesic effect that the samples of Cymbalta with which Bauman had been provided at the time of the collision may have masked the symptoms of Bauman's neck, shoulder and back injuries Bauman attributes to the collision.

Corporate Defendants' request that the court disregard Dr. Hallett's Affirmation, submitted as an expert witness, for noncompliance with Rule 26(a)(2)(C), is, therefore, GRANTED.

### B.    Permanent Consequential Limitation of Use of a Body Organ or Member/Significant Limitation of Use of a Body Function or System

Bauman alleges numerous physical problems with neck, lower back, and right shoulder resulting in permanency or "significant limitation of use of a body organ, member, function or system" as required under § 5102(d).  R Dkt. 59 at 6 ¶ 36. Although Corporate Defendants do not argue in opposition nor present any evidence in support of summary judgment on this point, a review of Bauman's medical records establishes they fall short of demonstrating a "serious injury" under these categories.

Because both a "consequential limitation" and a "significant limitation" are similarly construed as more than a "'minor, mild or slight limitation of use," *Gaddy v. Eyler*, 591 N.E.2d 1176, 1177 (N.Y. 1992) (quoting *Licari*, 441 N.E.2d at 1091, and citing *Scheer v. Koubek*, 512 N.E.2d 309, 309 (N.Y. 1987)), the court addresses both categories together.  As used in § 5102(d), "significant" is "construed to mean

something more than a minor limitation of use." *Licari*, 441 N.E.2d at 1091.

Specifically, "a minor, mild or slight limitation of use should be classified as insignificant

within the meaning of [§ 5102(d)]." *Id.*   Accordingly, for Bauman to establish a serious

injury under these categories and avoid summary judgment, Bauman must establish

both that her injuries resulted in limited use of a body organ, member, function or

system, as well as that such limitation is significant. *Licari*, 441 N.E.2d at 1092-93.

Where, as here, a plaintiff seeks recovery of damages for a serious injury based

on a soft tissue injury associated with complaints of pain and loss of range of motion,

courts are to evaluate such claims with "well-deserved skepticism." *Pommells*, 830

N.E.2d at 281.   Although the medical evidence establishes Bauman has several

herniated and bulging discs in her cervical and lumbar spines, a diagnosis of general

disc pathology, including a bulging or herniated disc, alone is insufficient to establish a

serious injury under § 5102(d).   *See Pommells*, 830 N.E.2d at 282 ("Proof of a herniated

disc, without additional objective medical evidence establishing that the accident

resulted in significant physical limitations, is not alone sufficient to establish a serious

injury.").   *See also Toure*, 774 N.E.2d at 1201 n. 4 (recognizing New York's "Appellate

Divisions have held that a diagnosis of a bulging or herniated disc, by itself, does not

constitute a serious injury." (citing cases)).   Rather, such claims "must be supported by

medical records and may not be based solely on plaintiff's testimony and subjective

complaints of pain." *Jones v. United States*, 408 F.Supp.2d 107, 117 (E.D.N.Y. 2006).

Admissible objective evidence for this purpose includes X-rays, MRIs and CT scans,

use of a goniometer or inclinometer to measure range of motion, straight leg raising test

to detect pain, and other objective medical testing. *O'Gorman v. Prus*, 10 N.Y.S.3d 830,

833 (Westchester Cty. 2015). "'MRIs, X-rays and CT scans are objective and credible medical evidence of a serious injury because they do not rely on the patient's complaints of pain.'" *Davis v. United States*, 2012 WL 88307, at * 5 (N.D.N.Y. Jan. 11, 2012) (quoting *Mastrantuono v. United States*, 163 F.Supp.2d 244, 254 (S.D.N.Y. 2001)). The "extent or degree of physical limitation" posed by an injury also may be proven by "an expert's designation of a numeric percentage of a plaintiff's loss of range of motion can be used to substantiate a claim of serious injury." *Toure*, 774 N.E.2d 1197, 1200 (N.Y. 2002). Although "there is no set percentage for determining whether a limitation in range of motion is sufficient to establish 'serious injury,' the cases have generally found that a limitation of twenty percent or more is significant for summary judgment purposes." *Hodder v. United States*, 328 F.Supp.2d 335, 356 (E.D.N.Y. 2004) (collecting cases). "[L]ess than 20% limitation has been found insufficient to survive a motion for summary judgment." *Id.* Where, however, a decreased ROM is asserted as proof of a serious injury, the medical findings must indicate the methodology used to calculate the reduced ROM, as well as whether such methodology consisted of active or passive ROM tests. *Watson-Tobah v. Royal Moving & Storage, Inc.*, 2014 WL 6865713, at *18 (S.D.N.Y. Dec. 5, 2014) (holding medical reports of restricted ranges of motion were "insufficient to overcome defendants' prima facie showing of the absence of a serious injury" so as to meet plaintiff's burden in opposing summary judgment because "there is no indication as to the methodology used to calculate the degrees of restriction and whether the tests conducted were passive or active range-of-motion tests.").

The difference between "active" and "passive" range of motion tests has been explained by one court as follows:

> [T]here are two types of range of motion tests: passive and active. In performing active range of motion tests, the patient is asked to move the body part at issue in various directions and is asked to indicate when further movement become restricted or painful. In the passive range of motion test, the examiner moves the injured body part until the motion is restricted or pain is created. The doctor measures the range of the patient's ability to move the subject body part, sometimes with a protractor, and then compares that to the patient's 'normal' range of motion if the patient has a prior history with the doctor, or with what is considered normal of people of the same age and sex of the patient.
>
> The results of the passive test are based upon more objective criteria, because the doctor controls the movements. However, the fact is that most doctors will stop moving the patient once the patient begins to complain of pain, whether truthful or not. Thus, courts have required that the physician conduct objective range of motion tests, and quantify the results of the range of motion tests.

*Hodder*, 328 F.Supp.2d at 355 (citations and quotation marks omitted).

Courts have not hesitated to dismiss claims on summary judgment where the plaintiff's medical evidence fails to specify the objective medical tests performed or to explain whether the ROM tests conducted were active or passive. *See*, *e.g.*, *Hodder*, 328 F.Supp.2d at 356-57 (holding plaintiff failed to establish a serious injury under § 5102(d) based on decreased ROM of spine where treating chiropractor failed to clarify whether tests he conducted to elicit decreased ROM results were active or passive); *Palasek v. Misita*, 734 N.Y.S.2d 587, 588 (2d Dep't 2001) (affirming summary judgment for the defendant where, *inter alia*, plaintiff's treating physician's affidavit "failed to set forth the objective medical tests performed by the examining physician to determine that the plaintiff suffered specifically-quantified restrictions of motion in her neck and back."); and *Gillick v. Knightes*, 719 N.Y.S.2d 335, 336 (2d Dep't 2001) ("We have repeatedly held that a diagnosis of loss of range of motion, because it is dependent on the patient's

subjective expression of pain, is insufficient to support an objective finding of serious injury.").  In the instant case, Bauman has submitted medical records showing she has decreased active and passive ROM in her right shoulder, and active ROM in her cervical spine, but Bauman's medical records fail to establish the methodology by which the decreased ROMs were ascertained such that Bauman cannot establish she sustained under § 5102(d) a serious injury based on a permanent or significant loss of use of a body part, member, function or system.

In particular, on April 2, 2013, Dr. O'Brien found Bauman to have significantly decreased active ranges of motion in her right shoulder, with extension limited to 45 degrees compared to 60 degrees for normal shoulder extension ROM, flexion limited to 114 degrees compared to 180 degrees for normal, and abduction limited to 117 degrees compared to 180 degrees normal.  B Dkt. 56-6 at 6.  Passive ranges of motion for Bauman's right shoulder were 140 degrees for extension with 180 degrees normal, and 90 degrees for abduction with 180 degrees normal.  *Id.*  All such decreased ranges of motion, both active and passive, for Bauman's right shoulder were with pain.  *Id.*  Similar decreased active ranges of motion were observed for Bauman's cervical spine.  *Id.*

Despite this medical report indicating Bauman had decreased ranges of motion for her right shoulder and cervical spine,[19] the report fails to indicate the methodology by which the ranges of motion were ascertained indicated.  Significantly, as discussed above, the medical evidence's failure to set forth the methodology used to determine the asserted deficits in Bauman's ROM is fatal to this aspect of her serious injury claim.

---

[19] Nor do any other medical reports in the record of measurements of Bauman's ROM, active or passive, relative to her alleged injuries, indicate the methodology used to obtain such ROM measurements.

C.      The "90/180 Category"

There is no merit to Bauman's contention that her injuries may be considered serious under § 5102(d)'s so-called "90/180 category," *Toure*, 774 N.E.2d at 1204, pursuant to which a plaintiff may recover damages if, as a result of an accident, the plaintiff suffered a non-permanent, medically determined injury or impairment that prevented the plaintiff "from performing "substantially all of the material acts which constitute [the plaintiff's] usual and customary daily activities for not less than" 90 of the 180-day period "immediately following" the injury.  N.Y. Ins. Law § 5102(d). Qualification as a serious injury under the "90/180 category" requires the non-permanent injury to have resulted from the accident, N.Y. Ins. Law § 5104(a), and be shown to have prevented a plaintiff "'from performing his usual activities to a great extent rather than some slight curtailment.'"  *Escoto v. United States*, 848 F.Supp.2d 315, 330 (E.D.N.Y. 2012) (quoting *Thompson v. Abbasi*, 788 N.Y.S.2d 48, 49 (1st Dep't 2005)).  Despite lacking "the 'significant' and 'consequential' terminology" of the two previously discussed categories, Discussion, *supra*, at 31-35, to establish a serious injury under the 90/180 category, "a plaintiff must present objective evidence of 'a medically determined injury or impairment of a non-permanent nature.'"  *Toure*, 774 N.E.2d at 1024 (quoting N.Y. Ins. Law § 5102[d]; and *Licari*, 441 N.E.2d at 1091-92).

In the instant case, the period of time with which the court is concerned with regard to Bauman establishing serious injury under the 90/180 category ends 180 days following the November 9, 2011 collision, *i.e.*, May 7, 2012.  Significantly, the record is devoid of any medical affidavit or statement from any medical provider who treated

Bauman during the relevant 180-day period attesting to Bauman's inability to engage in her customary daily activities for at least 90 of those 180 days.

Nor does Bauman dispute that she continued working cleaning houses for at least 90 of the 180 days immediately following the collision, and on January 12, 2015, Bauman reported she was no longer cleaning houses, but was "On SSD for depression & anxiety." B Dkt. 1 at 34. Bauman argues that because Corporate Defendants did not have Bauman examined by a physician within the 180 days following the collision, Corporate Defendants' expert physician is prohibited from opining as to whether Bauman "suffered a qualifying injury under the '90/180' category." B Dkt. 59 at 7, ¶ 39 (citing *Toussaint v. Claudio*, 803 N.Y.S.2d 564 (1st Dep't 2005)). Although courts have held that a defendant's expert may not opine on the extent of a personal injury plaintiff's injuries within the 180 days immediately following an automobile accident, *Toussaint*, 803 N.Y.S.2d at 565, where, as here, Bauman has failed to submit anything other than self-serving and conclusory statements that fail to adequately describe the customary and usual activities which Bauman alleges she was unable to perform for more than 90 of the 180 days immediately following the collision, the plaintiff cannot establish a significant injury under the 90-180 category. *See Buccilli v. United States*, 2016 WL 4940260, at * 10 (W.D.N.Y. Feb. 3, 2016) (a personal injury plaintiff's deposition testimony regarding limitations attributed to a serious injury under the 90/180 day category "must be substantiated by objective medical proof. Self-serving statements of pain or limitation are insufficient to raise a triable issue of fact." (citing cases)). *See also Jones v. Marshall*, 47 N.Y.S.3d 791, 793-94 (3d Dep't 2017) ("objective evidence, such as medically imposed limitations upon daily activities, must support a plaintiff's claim

under the 90/180-day category; self-serving assertions in this regard will not suffice."

(citing *Clausi v. Hall*, 6 N.Y.S.3d 771, 774 (3d Dep't 2015); and *Shea v. Ives*, 26

N.Y.S.3d 816, 819 (2016)).   Simply, the medical records pertaining to Bauman for the

relevant 180-day period, *i.e.*, November 9, 2011 through May 7, 2012, consist only of

diagnostic test results, such as X-rays and MRI studies, which contain no physician's

opinion or remark as to whether Bauman was able to perform his usual and customary

activities warranting summary judgment.   *See Turchuk v. Town of Wallkill*, 681 N.Y.S.2d

72, 73 (2d Dep't 1998) (holding personal injury plaintiff's self-serving statements that

she was unable to perform household chores for six months following automobile

accident, without more, were insufficient to establish the plaintiff sustained a medically-

determined injury that prevented the plaintiff from performing substantially all of her

usual and customary daily activities under the 90/180 category).

Accordingly, summary judgment should be GRANTED as to Corporate

Defendants on this aspect of Bauman's claim.

### D.   Causally Related

Although the undersigned is recommending granting summary judgment to

Corporate Defendants based on the failure of Bauman's medical records to establish

any of Bauman's alleged injuries meets the criteria to be considered "serious" under §

5102(d), in the interest of completeness, whether the evidence in the record shows the

existence of any genuine issue of fact as to whether any of Bauman's alleged injuries

was causally related to the collision is addressed in the alternative.

In addition to establishing an injury meeting the criteria of a serious injury as

defined by § 5102(d), Bauman must also establish the injury was caused by the

collision.  Significantly, "even where there is objective medical proof, when additional contributory factors interrupt the chain of causation between the accident and claimed injury – such as a gap in treatment, an intervening medical problem, or a preexisting condition – summary dismissal of the complaint may be appropriate." *Pommells*, 830 N.E.2d at 281.  As discussed above, Bauman has a preexisting history of complaints of back pain, such that it the court must compare Bauman's post-collision condition not only to normal ROMs for the affected joints, but also to her pre-collision ROMs.  *See*, *e.g.*, *Jones v. United States*, 408 F.Supp.2d 107, 119-20 (E.D.N.Y. 2006) ("While plaintiff has significant limitations in his neck and back functions, they are not the result of the January 2000 car accident; rather, they emanate from pre-existing cervical vertebrae degenerations and a disc herniation.").  Toward this end, Bauman's proof entirely fails because "[w]here, as here, a defendant's proof that the plaintiff has not sustained a serious injury as a result of the motor vehicle accident at issue rests in part on evidence that she had a preexisting condition prior to the accident, the plaintiff must address that contention in her medical reports" or face summary judgment.  *Brusso v. Imbeault*, 699 F.Supp.2d 567, 585-86 (W.D.N.Y. 2010) (citing cases).  Fatal to Bauman's serious injury claims based on her  cervical and lumbar spine is the absence of any evidence in the record establishing Bauman's cervical and lumbar spine ROMs prior to the collision, such that the court is unable to compare Bauman's cervical and lumbar spine ROMs after the collision.  Furthermore, even though the observation of degenerative changes prior to an accident does not necessarily preclude a determination that such degenerative changes left the plaintiff more injury-prone following a subsequent traumatic event which could aggravate preexisting injuries, *see*

*Brown v. Miller*, 50 N.Y.S.3d 693, 693 (4th Dep't 2017) (recognizing personal injury

plaintiff with preexisting degenerative changes in lumbar spine could recover for

causally related serious injury only if the plaintiff could establish collision aggravated or

exacerbated preexisting degenerative condition), more than a conclusory statement

from a treating physician is required to establish a causal connection.  *See Pommells*,

830 N.E.2d at 286-87 (where defendant presents evidence of preexisting degenerative

disc condition causing the plaintiff's alleged injuries, the plaintiff, to survive summary

judgment, must provide sufficient evidence, *i.e.*, more than a mere conclusory opinion,

to refute the defendant's evidence and raise an issue of fact for the jury).  Here, even

accepting Dr. Hallett's stricken opinion that Bauman's use of Cymbalta initially masked

the symptoms of her alleged injuries, Dr. Hallett makes no attempt to distinguish the

deficit in any of Bauman's ROMs before and after the collision but, rather, denies

Bauman ever complained of neck, back or shoulder pain prior to the collision, *see* B

Dkt. 59-1 at 2 ¶ 5 (Dr. Hallett commenting "Bauman did not complain of neck, back or

shoulder problems predating the 2011 collision in question."), despite evidence in the

record of preexisting injuries to all her back and neck.  *See* B Dkt. 56-6 at 141 (Bauman

complaining to Dr. O'Brien on January 13, 2010 of neck pain for which she saw a

chiropractor, and for which Dr. O'Brien prescribed Flexeril); and B Dkt. 56-6 at 137-39

(Dr. Hallett reporting on January 18, 2010, Bauman mentioned having hurt her back in

June 2009).  With regard to Bauman's right shoulder injury, however, no preexisting

injury has been established such that Bauman's decreased ROM for her right shoulder

need not be compared to any ROM other than those considered normal for a non-

injured shoulder joint.

Nevertheless, Bauman's failure to seek treatment for all three injuries, *i.e.*, to her back, neck and right shoulder, for months after the collision, including a single complaint to Dr. O'Brien on April 17, 2012, of generalized arthralgia particularly in her neck and left arm,[20] B Dkt. 56-6 at 27, but mostly only after Bauman was involved in a snowmobile accident in February 2013, is fatal to her serious injury claim because such gaps are sufficiently lengthy to constitute intervening factors severing any causality based on the collision. *See*, *e.g.*, *Barreras v. Vargas*, 58 N.Y.S.3d 31, 32 (1st Dep't 2017) (finding defendants demonstrated absence of causation through report of orthopedist who opined plaintiff's post-accident medical records showed no complaints of right shoulder pain and were inconsistent with any claim of traumatic injury to right shoulder and plaintiff did not seek treatment for claimed right shoulder injuries for several months after accident); *Jones v. MTA Bus Co.*, 999 N.Y.S.2d 68, 69 (1st Dep't 2014) (plaintiff failed to raise triable issue of fact as to whether she sustained serious injury where post-accident hospital and medical records showed the plaintiff made no complaints about injuries "until about five months after the accident, which was too remote in time to establish a causal relationship."); *Henchy v. VAS Exp. Corp.*, 981 N.Y.S.2d 418, 420-21 (1st Dep't 2014) (finding no causation established where the plaintiff's medical records showed she did not receive treatment for left knee injury for six months after the accident, and MRI study showing tears was not performed until seven months after the accident and such failure to provide contemporaneous evidence of injury was fatal to serious injury claim). *But see Perl v. Meher*, 960 N.E.2d 424, 428

---

[20] In July 2010, Dr. O'Brien diagnosed Bauman with a left rotator cuff condition in her left shoulder, B Dkt. 56-6 at 142, and Bauman did not complain about her right shoulder until June 18, 2015, with the July 28, 2015 MRI showing a right anterior labral tear and a SLAP lesion. R Dkt. 77-12 at 3.

(N.Y. 2011) (holding evidence established genuine issue of material fact as to whether physician's specific, numerical range of motion measurements of cervical and lumbar spines, made several years after automobile accident, demonstrated plaintiff suffered from a serious injury precluding summary judgment where initial examination of the plaintiff shortly after the accident showed difficulty moving and diminished strength in cervical and lumbar spines).

Finally, although Bauman has not identified her depression and anxiety disorders as serious injuries for which she seeks to recover damages from Defendants in this action, even if Bauman had included such disorders in her alleged serious injuries, that Bauman was diagnosed with such conditions years before the collision is well-established, and nothing indicates her psychiatric conditions were exacerbated by the collision; rather, Dr. Hallett's reports regarding Bauman indicate she reported, well after the collision, that she was feeling "better" (R Dkt. 81-8 at 2), and "o.k." (R Dkt. 81-9 at 2), and both her depression and anxiety were improving and rated as "mild in severity." *Id.* at 3, 8. As with physical injuries, for a psychological condition to qualify as a serious injury, Bauman must prove a causal relationship between her depression and anxiety and the collision. *See, c.f. Cummins v. U.S. Xpress, Inc.*, 2009 WL 857401, at * 4-5 (S.D.N.Y. Mar. 30, 2009) (to be granted summary judgment on serious injury claim based on anxiety, defendant must provide evidence the plaintiff was taking anti-anxiety medication prior to the accident). Here, Bauman's medical records are replete with references to Bauman using multiple medications to relieve depression and anxiety prior to the collision, a fact that is underscored by statements in Dr. Hallett's Affirmation, B Dkt. 59-1, albeit, stricken, that one such medication, Cymbalta, may have masked the

symptoms of the physical injuries Bauman here maintains she sustained as a result of the collision.

Nor can Bauman's self-serving testimony, *i.e.*, that she had to decrease the amount of time she spend cleaning houses following the collision, R Dkt. 81-7 at 3-5, be relied on by Bauman to defeat summary judgment absent some objective medical evidence corroborating such testimony.  *See Escoto v. United States*, 848 F.Supp.2d 315, 330 (E.D.N.Y. 2012) ("The plaintiff's allegations that her injuries fell within the 90/180 day category must be substantiated by objective medical proof; self-serving statements are insufficient.").  Significantly, Bauman reported on November 12, 2008, three years prior to the collision, that she was cleaning houses only three mornings three days a week because Bauman "[c]an't handle anything else."  R Dkt. 81-6 at 2.

Accordingly, Bauman has failed to sufficiently distinguish the evidence in the record of preexisting injuries to her neck and back from the current condition of Bauman's neck and back such that the question of whether Bauman's asserted neck and back injuries are causally related to the collision may not be presented to the jury. Similarly, Bauman has not distinguished her mental health condition before and after the collision such that no serious injury based on Bauman's depression or anxiety may be presented to the jury.  Finally, Bauman's failure to timely seek treatment for her right shoulder injury, which was not pre-existing, prevents Bauman from now arguing such injury is causally related to the collision.  As such, Corporate Defendants' motion for summary judgment should be GRANTED insofar as Bauman is unable to establish any of her claimed serious injuries is causally-related to the collision.

4.    **Motion to Dismiss**

Prior to moving for summary judgment, Corporate Defendants moved to dismiss the Bauman Action as a sanction based on Bauman's failure to comply with court-ordered discovery.  B Dkt. 49.[21]  In particular, Corporate Defendants maintain that despite the undersigned's October 17, 2016 Decision and Order (B Dkt. 36) ("October 17, 2016 D&O"), granting Defendants' motion to compel (B Dkt. 30), and ordering Bauman to fully respond to all of Defendants' then outstanding discovery requests that were subject to the motion to compel within 20 days of the Decision and Order, Bauman had failed to so comply, such that Defendants move to dismiss the Bauman Action pursuant to Fed.R.Civ.P. 26(b)(2)(A)(v) (providing an action may be dismissed, in whole or in part, as a sanction for failing to obey a discovery order).  B Dkt. 49 at 2.  According to Corporate Defendants, because the October 17, 2016 D&O addressed Defendants' second motion to compel, and the sanction of awarding costs having already been applied, the extreme sanction of dismissal of the Bauman Action in its entirety is warranted.  *Id.* at 2-3.  In opposing the motion to dismiss, Bauman maintains her motion, filed November 10, 2016, B Dkt. 41, seeking, *inter alia*, reconsideration of the October 17, 2016 D&O, confusion regarding the status of the earlier motion to compel, and difficulties with electronically filing papers with this court's Case Management/ Electronic Court Filing program prevented or excused Bauman from filing the discovery as the October 17, 2016 D&O directed, pending resolution of the motion for reconsideration, and again requested reconsideration of the October 17, 2016 D&O on the basis that Bauman has since provided the discovery that was subject to the earlier

---

[21] Defendant Singh has not joined in the motion to dismiss.

motion to compel.  B Dkt. 53.  In further support of their motion to dismiss, Corporate

Defendants argue Bauman has failed to show any reason for the court to reconsider its

earlier October 17, 2016 D&O, including any intervening change of controlling law, the

availability of new evidence, or the need to correct a clear error or to prevent manifest

injustice.  B Dkt. 57.

Insofar as Bauman requests reconsideration of the October 17, 2016 D&O, the

undersigned already denied such request on April 12, 2017 (B Dkt. 60).  Accordingly,

Bauman's newly asserted request for reconsideration is DENIED.  Further, should the

District Judge agree with the undersigned's recommendation that summary judgment be

GRANTED in favor of Corporate Defendants, Corporate Defendants' motion to dismiss

will be rendered moot.  Accordingly, Corporate Defendants' motion to dismiss is

DISMISSED as moot, without prejudice and with leave to renew should the District

Judge disagree with the recommendation that summary judgment be granted in

Corporate Defendants' favor.

## CONCLUSION

Based on the following, Corporate Defendants' motion to dismiss (B Dkt. 49),

should be DISMISSED as moot; and Corporate Defendants' motion for summary

judgment (B Dkt. 56), should be GRANTED.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      September 28, 2017
              Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**<u>Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.</u>**

*Thomas v. Arn*,  474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*,  892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited*,  838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      September 28, 2017
            Buffalo, New York